UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLIN BOWER, on his own behalf and on behalf of his minor children, N and R, <br><br>     Plaintiff, <br><br> v. <br><br> MIRVAT EL-NADY BOWER and EGYPTAIR AIRLINES, <br><br>     Defendants. | DOCKET NO: 10-cv-10405 NG <br><br> LEAVE TO FILE GRANTED ON DECEMBER 9, 2011 |

## DEFENDANT EGYPTAIR AIRLINES COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

EgyptAir Airlines Company, incorrectly sued herein as EgyptAir Airlines and hereafter "EgyptAir," respectfully submits this memorandum of law in support of its motion for summary judgment dismissing the Amended Complaint as against EgyptAir.

## BACKGROUND OF THE CASE AND SUMMARY OF ARGUMENTS

Plaintiff Colin Bower and defendant Mirvat El-Nady ("El-Nady") were divorced in Massachusetts on December 1, 2008.  *See* EgyptAir's Rule 56.1 Statement, ¶ 17 ("56.1, ¶ __"). The Massachusetts court issued a Judgment of Divorce which granted the parents joint physical custody, and plaintiff sole legal custody, of their children, N. and R. (the "custody order"). *Id*., ¶ 18. The custody order also prohibited El-Nady from taking the children out of Massachusetts. *Id*., ¶ 19.

On or about August 7, 2009, plaintiff dropped the children off at El-Nady's home in Massachusetts for a court-ordered visit. *Id*., ¶ 22.  On August 11, 2009, El-Nady and her children

arrived at JFK Airport in New York, purchased tickets, and traveled on a regularly scheduled EgyptAir flight from New York to Cairo, Egypt (the "Flight"). *Id*., ¶¶ 21, 24, 38. El-Nady and her children are Egyptian citizens, and they used their Egyptian passports for the travel. *Id*., ¶ 36.

Plaintiff had no communication or relationship of any type with EgyptAir prior to the Flight.  He was not at the airport, and never advised EgyptAir that he and El-Nady were divorced, or that the custody order had been issued, or that El-Nady might travel with her children in violation of the custody order, or that he objected to such travel. *Id*., ¶¶ 25-31. In short, EgyptAir had no reason to know that plaintiff even existed.  He nonetheless claims that EgyptAir improperly "facilitated" El-Nady's travel with her children because EgyptAir did not, as a condition of allowing them to purchase the tickets and board the Flight, investigate to determine whether El-Nady was the children's mother, whether a custody order concerning them existed, and whether plaintiff consented to the travel.  *Id*., ¶¶ 32-33.

All of the claims against EgyptAir are based directly upon the ticketing, check-in and boarding services provided by EgyptAir to El-Nady and her children at JFK Airport.  All of these claims are preempted and barred by the Airline Deregulation Act[1], which prohibits a state from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to a price, route or service of an air carrier."  49 U.S.C. § 41713(b)(1).

All of the claims against EgyptAir also are preempted and barred by a treaty of the United States known as the Montreal Convention[2] because they all arise out of EgyptAir's transportation of the children from New York to Cairo.  The Montreal Convention precludes

---

[1]  49 U.S.C. §§ 40101, *et seq.*

[2] *See* Convention on the Unification of Certain Rules of International Carriage by Air, done at Montreal on 28 May, 1999, ICAO Doc. No. 9740 (entered into force November 4, 2003), *reprinted in* S. Treaty Doc. 106-45, 1999 WL 333292734.

recovery for claims arising out of international air carriage unless the plaintiff can establish that the passenger involved suffered a "bodily injury" caused by an "accident" on board the aircraft. Plaintiff cannot establish either of these elements.

Moreover, all of the claims against EgyptAir are barred because no duty exists requiring a commercial air carrier to investigate and determine, as a condition of carriage, whether a child is being transported in violation of a custody order.  Because no such duty exists, EgyptAir could not have breached a duty to plaintiffs.

Finally, each of the state law claims should be dismissed because plaintiff cannot establish the requisite elements of those claims.

## STATEMENT OF FACTS

The facts upon which this motion is based are set forth in EgyptAir's Rule 56.1 Statement.

## ARGUMENT

## I

## THE CLAIMS ARE PREEMPTED
## BY THE AIRLINE DEREGULATION ACT

All of the claims against EgyptAir are preempted and barred by the Airline Deregulation Act ("ADA") because they all relate directly to the ticketing, check-in and boarding services provided by EgyptAir to its passengers.

The ADA's preemption clause prohibits a state from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to a price, route or

*service* of an air carrier."   49 U.S.C. § 41713(b)(1)(emphasis added).[3]   State statutory and common law claims constitute a "provision having the force and effect of law" for purposes of the ADA.   *See DiFiore v. American Airlines, Inc*., 646 F.3d 81 (1st Cir. 2011)(preempting state statute); *United Airlines, Inc. v. Mesa Airlines, Inc.,* 219 F.3d 605, 607 (7th Cir. 2000)("State common law counts as an 'other provision having the force and effect of law'").

The U.S. Supreme Court has interpreted the preemptive effect of the ADA broadly.   Any statute or common law "'*having a connection with or reference to'* carrier 'rates, routes, or services' [is] preempted."   *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364, 370, 128 S.Ct. 989, 995, 169 L.Ed 2d 933 (2008)(emphasis in original)(*quoting Morales v Trans World Airlines, Inc*., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed. 2d 157 (1992).   Such preemption may occur "even if a state law's effect on rates, routes or services 'is only indirect.' … [I]t makes no difference whether the state law is 'consistent' or 'inconsistent' with federal regulation, and pre-emption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives." *Id*. (*quoting Morales*, 504 U.S. at 386-387, and 390).   *See also Air Transport Association of America, Inc. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008)("noting that the Supreme Court in *Rowe* "necessarily defined 'service' to extend beyond prices, schedules, origins and destinations.").

The ADA "preempts both laws that explicitly refer to an airline's [services] and those that have a significant effect upon [services]."   *Buck v. American Airlines, Inc*., 476 F.3d 29, 34-35

---

[3]   The ADA preemption provision applies to both domestic and foreign air carriers. *In re Korean Air Lines, Co., Ltd., Antitrust Litigation*, 642 F.3d 685, 696 (9th Cir. 2010)("ADA's preemption of state regulation covers regulation of all air carriers, whether domestic or foreign). *See also Morales v Trans World Airlines, Inc*., 504 U.S. 374, 383-85, 112 S.Ct. 2031, 119 L.Ed. 2d 157 (1992)(preempting claims against foreign air carriers); *Buck v American Airlines, Inc*., 476 F.3d 29, 36 (1st Cir. 2007)(same); *Weiss v. El Al Israel Airlines*, 309 Fed. Appx. 483 (2d Cir. 2009)(same).

(1st Cir. 2007).  *See also DiFiore,* 646 F.3d at 88.

The term "services" within the meaning of the ADA includes airline ticketing, check-in and boarding procedures. *Chukwu v. Board of Directors of British Airways*, 889 F.Supp. 12, 14 (D. Mass. 1995)(the process of boarding a flight is "uniquely within the service provided and controlled by air carriers"), *aff'd mem.*, 101 F.3d 106 (1st Cir. 1996); *DeTerra v. America West Airlines, Inc*., 226 F.Supp.2d 274, 277 (D. Mass. 2002)("Handicapped passenger's claims for negligence and for intentional infliction of emotional distress arising out of his attempt to board a flight related to "service" within the meaning of the ADA); *Air Transport Association,* 520 F.3d at 223 (Agreeing with the majority of circuits that "services" includes "the provision or anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink--matters incidental to and distinct from the actual transportation of passengers."); *Onoh v. Northwest Airlines, Inc*., 613 F.3d 596 (5th Cir. 2010)(preemption of a state law claim for intentional infliction of emotional distress arising out of denied boarding of a passenger who did not have proper travel documents.); *Smith v Comair, Inc*., 134 F.3d 254, 259 (4th Cir. 1998)("[u]ndoubtedly, boarding procedures are a service rendered by an airline"); *Hodges v. Delta Airlines, Inc*., 44 F.3d  334, 336 (5th Cir. 1995)(*en banc*)(service includes "ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1433 (7th Cir. 1996)(adopting *Hodges*); *Koutsouradis v. Delta Air Lines, Inc*., 427 F.3d 1339 (11th Cir. 2005)(adopting *Hodges*);   *See also DiFiore,* 646 F.3d at 87-88 (noting that in view of *Rowe's* expansive treatment of the term "service," it includes "steps that occur before and after the airplane is actually taxiing or in flight.")

A tort claim is preempted by the ADA if the activity at issue directly involves an airline service, and was reasonably necessary in order for the airline to provide that service. *See Rombom v. United Air Lines, Inc.*, 867 F.Supp. 214, 221-22 (S.D.N.Y. 1994).

The ADA preempts all of the claims against EgyptAir because they relate directly to the ticketing, check-in and boarding services provided by EgyptAir to its passengers. These claims stem directly from the fact EgyptAir sold the tickets to El-Nady and her children, checked them in for the Flight, and flew them to Cairo, without confirming the existence of a custody order or plaintiff's consent to the travel.  Moreover, the ticketing and check-in procedures utilized by EgyptAir, which plaintiff is seeking to change, were necessary for EgyptAir to provide its services to El-Nady and her children (as well as all of its other passengers).

As part of its ticketing, check-in and boarding services, EgyptAir is only required to review the passenger's passport to confirm that it is valid and unexpired, contains any necessary visas, and contains a photograph that matches the passenger using it. 56.1, ¶¶ 54-61. Plaintiff seeks to force EgyptAir (and all carriers) to radically alter the way it provides these services to include the duty to investigate and confirm: (1) the relationship between every adult and child traveling together; (2) the existence and terms of any custody order that might have been issued with respect to the child; and (3) whether the child's non-traveling parent(s) is aware of and has consented to the child's travel. 56.1, ¶¶ 32-33.

These new procedures plaintiff seeks to impose are not required by any state or federal law, rule or regulation, and are not mandated by EgyptAir or any other commercial air carrier. 56.1, ¶¶ 55-61. These procedures are not utilized by the U.S. Transportation Security Administration when clearing passengers through airport security checkpoints on their way to the boarding gates. *Id*., ¶ 61. They also are not recommended by the International Air Transport

Association, the worldwide commercial air carrier trade association of which EgyptAir and all commercial air carriers are members. *Id.*, ¶¶ 63-64. The only circumstances where documentation beyond a passport is used or required for travel is when the passenger travels to certain countries that require evidence of the non-traveling parent's consent as a condition of entry into the country.[4] *Id.*, ¶¶ 65-66. Egypt does not impose this requirement. *Id.*, ¶ 67. This additional documentation is not an airline requirement, practice or procedure. It is simply another travel document required by the laws of the destination country – like a passport or visa. *Id.*, ¶ 66.

As a practical matter, a commercial air carrier is unable to implement such a "family relationship verification" scheme. Putting aside the enormous privacy issues involved in requiring passengers to reveal sensitive family information in order to exercise their constitutional right to travel, commercial air carriers simply are not equipped to perform acts such as verifying the authenticity of birth certificates, marriage certificates, and child custody orders (especially when issued by foreign countries). In fact, in a recent study concerning child abduction issues, the U.S. Government Accountability Office noted that "[a]s private sector entities, airlines in the United States do not have the authority to verify or enforce court and custody orders." Government Accountability Office Report to Subcommittee on Aviation Committee on Transportation and Infrastructure, House of Representatives, GAO-11-602, dated June 23, 2011, p. 8. (www.gao.gov/new.items/d11602.pdf). Similarly, airlines simply do not have the manpower required to track down and contact non-traveling parents to discuss their children's travel. *Id.*, pp. 19-20 ("DOT officials added that, if a consent document were required

---

[4] Plaintiff apparently concedes that the mandatory use of parental consent forms is limited to travel to these countries, because he carefully limits his allegation concerning their use as follows: "[C]ertain air carriers used such forms prior to August 2009, *at least for certain international travel*." Amended Complaint, ¶ 21 (emphasis added).

on all children traveling internationally, airline employees would not be able to call the parent not traveling to verify and confirm the parent's consent, given the sheer volume of children traveling.").

Even assuming, *arguendo*, such procedures could be implemented, they clearly would have the prohibited "connection with or reference to" air carrier ticketing, check-in and boarding services. *Morales,* 504 U.S. at 384. If allowed to proceed, plaintiff's claims would have the effect of directly regulating how air carriers perform those services – just as if Massachusetts had enacted a law dictating how those services were to be performed. Not only would EgyptAir be required to add staff to handle these new procedures (thereby also affecting the prices it charges for its services in order to pay for this extra help), it also would need to develop and implement new training and procedures, and new databases, to carry out these passenger interrogations and investigations. Moreover, because similar cases might be brought in other courts around the country, this state regulation of air carrier services quickly would lead to a chaotic "patchwork of state service-determining law, rules, and regulations" - which is precisely what the ADA was designed to avoid. *Rowe,* 552 U.S. at 373; *DiFiore*, 646 F.3d at 88.

In earlier court filings in this case, plaintiff signaled his intent to rely on *Streeter v Executive Jet Management, Inc*., 2005 WL 4357633 (Sup. Ct. Conn. Nov. 10. 2005). *Streeter* involved a parental abduction to Egypt using a privately chartered aircraft. The trial judge rejected the defendant's ADA preemption argument based upon his conclusion that the ADA is limited to issues concerning economic regulation, and his adoption of the minority position concerning the definition of "services" as articulated by the Ninth Circuit. *Id*., at *3. The *Streeter* trial court's reasoning on the economic regulation issue subsequently was rejected by the Supreme Court in *Rowe*, where the Court specifically held that the preemptive effect of the ADA

is not confined to state laws aimed at economic regulation of air carriers as opposed to other state interests. *Rowe*, 552 U.S. at 373-76. Similarly, the narrow definition of services adopted by the Ninth Circuit has been rejected by the majority of the Courts that have decided the issue, including the First and Second Circuits. *See DiFiore, supra*; *Air Transport Association, supra*.

Plaintiff's claims in this case directly relate to EgyptAir's ticketing, check-in and boarding services because they all are based on his allegation that those services provided to     El-Nady and her children were incomplete, inadequate and performed improperly.   Moreover, through his claims he seeks to directly regulate the manner in which EgyptAir (and all air carriers) perform these services because compliance with plaintiff's requested procedures would require extensive changes to the existing services.   Accordingly, all of plaintiff's claims against EgyptAir are preempted by the ADA, and the Amended Complaint should be dismissed in its entirety.

## II

## THE CLAIMS ARE PREEMPTED AND BARRED BY THE MONTREAL CONVENTION

All of the claims against EgyptAir arise directly out of the children's travel on the EgyptAir Flight from New York to Cairo.  Accordingly, they all are governed exclusively by the terms and conditions of the Montreal Convention.

As a treaty of the United States, the Montreal Convention is the supreme law of the land. *See,* U.S. Const. art. VI, cl. 2; *Husain v. Olympic Airways,* 540 U.S. 644 (2004) .  The Convention applies to all international carriage of persons "which, according to the agreement between the parties [the passenger ticket], the place of departure and the place of destination … are situated … within the territories of two States Parties." Montreal Convention, Article 1(2).  The EgyptAir Flight provided for air transportation from New York to Cairo.  The United States and Egypt are parties to the Montreal Convention.   *See* International Civil Aviation Organization List and

Current Status of International Air Law Multilateral Treaties/Montreal Convention (available at http://www.icao.int/icao/en/leb/mtl99.pdf).

Article 29 of the Convention provides, in part, that "[i]n the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under the Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention." Accordingly, the Montreal Convention applies to the subject air transportation and governs all of the claims against EgyptAir.  *Gustafson v. American Airlines, Inc.*, 658 F.Supp.2d 276, 280 (D. Mass. 2009)("If the Montreal Convention applies, it 'preempts the remedies of the signatory's domestic law, whether or not the application of the Convention will result in recovery in a particular case.'").[5] *See also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("recovery for a personal injury suffered 'on board [an] aircraft … , if not allowed under the Convention, is not available at all."); *Acevedo-Reinoso v. Iberia Lineas Aereas De Espana S.A.*, 449 F.3d 7, 13 (1st Cir. 2006)(same); *Souza v. American Airlines, inc.*, 2011 WL 2749086 *2-3 (S.D.N.Y. Jul 7, 2011)(same).

Article 17 of the Montreal Convention provides that an air carrier "is liable for damage sustained in case of death or *bodily injury* of a passenger upon condition only that the *accident*

---

[5] Because most of the provisions of the Montreal Convention are taken directly from the Warsaw Convention (Convention for the Unification of Certain Rules Relating to International Transportation by Air, Concluded at Warsaw Poland, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (1934), *reprinted in* 49 U.S.C. § 40105 (1997) (note)), courts consistently have applied case law interpreting provisions of the Warsaw Convention to cases involving substantively similar provisions of the Montreal Convention.  *See, e.g., Gustafson,* 658 F.Supp.2d at 282; *Baah v. Virgin Atlantic Airways Ltd.*, 473 F.Supp.2d 591, 596-97 (S.D.N.Y. 2007).  All of the Articles of the Montreal Convention involved in this motion are substantively similar to their counterparts in the Warsaw Convention (Article 17 (both), Article 29 (Montreal) and Article 24 (Warsaw)).

which caused the death or injury took place on board the aircraft[6] or in the course of any of the operations of embarking or disembarking." *Id*. (emphasis added).    Mental injuries unaccompanied by bodily injuries are not compensable under the Montreal Convention. *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991); *Ehrlich v American Airlines, Inc.*, 360 F.3d 366, 400 (2d Cir. 2004); *In re Air Crash at Little Rock Arkansas*, 291 F.3d 503, 510 (8th Cir. 2002).

The Supreme Court has defined an "accident" as "an unexpected or unusual event or happening that is external to the passenger."  *Air France v. Saks*, 470 U.S. 392, 405 (1985).  A two prong test applies to determine whether an accident under the Montreal Convention has occurred. The evidence must demonstrate "that (1) an unusual or unexpected event that was external to [the passenger] occurred, and (2) this event was a malfunction or abnormality in the aircraft's operation." *Gotz v Delta Air Lines, Inc.*, 12 F.Supp.2d 199, 201-202 (D. Mass. 1998). *See also Goodwin v British Airways PLC*, 2011 WL *3, 3475420 (D. Mass Aug. 8, 2011); *Garcia-Ramos v. Transmeridian Airlines, Inc.*, 385 F.Supp.2d 137, 141 (D. P.R. 2005).

### A.    The Children's Claims are Barred by the Montreal Convention.

The claims asserted by plaintiff on behalf of the children are barred because (1) their travel on the Flight did not involve an "accident" and (2) they did not suffer any bodily injuries.

Liability under Article 17 arises only if a passenger's injury is caused by an "an unexpected or unusual event or happening that is external to the passenger." *Air France*, 470 U.S. at 405.  "When the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident."

---

[6] Although certain of the activities of which plaintiff complains took place at the EgyptAir ticket counter, all of plaintiff's claims are based directly on the allegation that the children were transported to Egypt in violation of the custody order.  If the children had not flown to Egypt, EgyptAir would not be a defendant in this case.

*Id.*, at 406.  Plaintiff has not alleged, nor is there any evidence of, any unusual, abnormal, or unexpected operation of the aircraft.  There is no evidence that anything unusual occurred during El-Nady's travel with her children on the Flight, and the circumstances surrounding El-Nady's purchase of the tickets and boarding of the Flight were completely normal, ordinary and commonplace.  *See* 56.1, ¶¶ 35-61, and the discussion of those circumstances set forth in Point III, *infra*.  Accordingly, because plaintiff cannot establish the requisite "accident," the children's claims must be dismissed.

Even if this Court were to find that an "accident" occurred on the aircraft, these claims still must be dismissed because plaintiff has not alleged, nor can he prove, that the children suffered the requisite "bodily injury." *Id.*, ¶¶ 72-75. Plaintiff has alleged only that the children suffered "trauma and personal injury" and "illness and injury, including significant trauma and emotional distress, with physical manifestations." *See* Amended Complaint, ¶¶ 36, 41. He has not produced any evidence to support these allegations.  Moreover, he has not produced any medical records or expert medical reports to establish that the children suffered any injuries at all.  In fact, he testified at deposition that he is not aware of whether the children have even received any medical treatment since they left the United States with their mother. *Id.*, ¶¶ 72-75.

Accordingly, because no evidence exists that the children suffered the requisite bodily injury, all of their claims must be dismissed.[7]

---

[7]  Similarly, the *Streeter* court dismissed the children's claims because there were no allegations or evidence that they had sustained the requisite bodily injury. *Streeter v. Bruderhof Communities in New York, Inc*., 48 Conn.Supp. 554, 560-64, 852 A.2d 889, 893-95 (Sup. Ct. Conn. 2003).

**B.      Plaintiff's Claims are Barred by the Montreal Convention.**

Plaintiff's inability to prove that the children suffered "bodily injuries" as the result of an "accident" on board the aircraft also results in his own claims being barred by the Convention. The language of Article 17 does not limit its scope to claims asserted *by passengers* on international flights.  Rather, it provides that an air carrier "is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft. …" *Id.*

> [T]he [Warsaw] Convention's preemptive range is not limited solely to claims by the international traveler.  Instead, the Convention's 'cardinal purpose,' as observed by the Supreme Court and recited in this order, is to achieve uniformity of rules governing claims arising from international air transportation generally. *Tseng*, 525U.S. at 169, 119 S.Ct. 662.  Thus, the Convention extends to claims by non-passengers based on events during international air travel.  Even Article 17, which provides the exclusive remedy for personal injuries under the Convention, delineates liability in universal terms and not merely in terms personal to the passenger. *See Diaz Lugo v American Airlines, Inc.*, 686 F. Supp. 373, 376-77 (D.P.R. 1998)(allowing damages for loss of consortium by non-passenger under Article 17 but rejecting all other local claims).

*Miller v Continental Airlines, Inc.*, 260 F. Supp. 2d 931, 940 (N.D. Ca. 2003).

The contributory negligence provision set forth in Article 20 of the Montreal Convention further establishes that claims by non-passengers arising out of events during international transportation are governed by the Convention. Article 20 provides, in part, that "[w]hen by reason of … injury of a passenger compensation is claimed by a person other than the passenger, the carrier shall likewise be wholly or partly exonerated from its liability to the extent that it proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of that passenger." *Id*.  Accordingly, when a non-passenger presents a claim based

upon an alleged injury to a passenger on board an aircraft, Article 20 bars that non-passenger from recovery in circumstances where the passenger himself cannot recover.

Similarly, the exclusivity provision set forth in Article 29 of the Montreal Convention makes it clear that the Convention applies to claims by non-passengers.  Article 29 provides, in pertinent part, that "[i]n the carriage of passengers, baggage and cargo, *any action for damages*, however founded, whether under the Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention." *Id.* (emphasis added).  This provision purposefully was worded in universal terms so that it is not limited to "any action for damages brought by a passenger."   Instead, it provides that the Convention applies to "any action for damages" related to the carriage of passengers – which would encompass plaintiff's claims in this litigation.

In practice, Courts routinely preclude non-passengers from recovering in cases where the underlying passenger claim is barred. *See, e.g. Alvarez v. American Airlines, Inc*., 1999 WL 691922 (S.D.N.Y. Sept 7, 1999)(wife's loss of consortium claim dismissed based on husband's injuries which were not compensable under the Warsaw Convention).

Accordingly, because the passenger claims underlying plaintiff's claims are barred, plaintiff's claims are barred as well.

### III

### EGYPTAIR DID NOT BREACH ANY DUTY TO PLAINTIFF OR THE CHILDREN

No legal or factual basis exists for plaintiff's claim that a commercial air carrier such as EgyptAir has a duty to investigate and determine whether a child custody order exists with respect to its child-passengers, or whether a non-traveling parent consents to the child's travel, as a condition of that travel. Similarly, no basis exists for his claims that the "circumstances"

surrounding the travel of El-Nady and her children created or imposed a duty on EgyptAir to investigate whether the children were traveling in violation of a custody order.

As an initial matter, to the extent that state law applies to any of plaintiff's claims, New York law applies to the issue of EgyptAir's liability because virtually all of EgyptAir's conduct involved in this case occurred at JFK Airport in New York.  *See e.g., Watkins v. Omni Life Science, Inc.*, 692 F.Supp.2d 170, 174 (D. Mass. 2010)("A court sitting in diversity applies the choice-of-law framework of the forum state.   Under Massachusetts choice-of-law rules, tort claims are governed by the law of the state in which the injury occurred, unless another state has a more significant relationship to the underlying cause of action. The place where the injury occurred is the place where the last event necessary to make an actor liable for an alleged tort takes place.")(citations and quotations omitted).  *See also, White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006)("'If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.").

In order to establish a tort claim under New York law, a plaintiff must establish, *inter alia*, that the defendant owed a duty of care and breached that duty. *Fox v. Marshall*, 88 A.D.3d 131, 135, 928 N.Y.S.2d 17 (2d Dep't 2011)("A duty of reasonable care owed by a tortfeasor to a plaintiff is elemental to any recovery in negligence. … Absent a duty of care, there is no breach, and without breach there can be no liability.")(citations omitted). Foreseeability of an injury does not determine the existence of duty, and "the duty owed by one member of society to another is a legal issue for the courts." *Id*.

A common carrier is not subject to a duty of extraordinary care.  "Rather, a common carrier is subject to the same duty of care as any other potential tortfeasor – reasonable care

under all of the circumstances of the particular case." *Bethel v New York City Transit Authority*, 92 N.Y.2d 348, 356 (1998).[8]

A commercial air carrier does not owe a duty to anyone to ferret out child custody orders as part of its transportation services. *Pittman v. Grayson*, 149 F.3d 111, 125 (2d Cir. 1998). In *Pittman*, the father of a child sued Icelandair for its alleged "participation" in his ex-wife's travel with their child from the U.S. to Iceland in violation of a custody order. The Court, applying New York law, held that the air carrier did not owe any duty to the non-traveling father, and did not owe a duty to the child to ensure that she was not being transported in violation of a court order.

> [The father] … lacked a viable negligence claim because Icelandair owed him no duty of care. In relation to Icelandair, [the father] was a member of the general public; he had not entered into any special relationship with the airline. And although Icelandair certainly owed some duties of care to [the child] as a passenger, we have seen no authority for the proposition that a common carrier has a duty … to ensure that a minor traveling with a custodial parent is not being transported in violation of a court order.

*Id.* at 125. This same result recently was reached by another appellate court in a parental abduction case against a commercial air carrier in California. *Braden v All Nippon Airways Co., Ltd*., 2010 WL 39932152 *4 (Cal. App. 2 Dist. Oct. 13, 2010).

While liability was imposed on a charter operator in the *Streeter* case, that decision was based on an incorrect analysis of the applicable law (and untested on appeal), and is not relevant here because it did not involve a commercial air carrier, and because the charter operator conceded that it breached several of its own sales and check-in procedures. *Streeter*, 2005 WL 4357633, *5-6, 14.

---

[8] Massachusetts imposes a higher duty of care on common carriers. *See Commerce Ins. Co. v. Ultimate Livery Service, Inc*., 452 Mass. 639, 641 n.4 , 897 N.E.2d 50 (2008).

In this case, no relationship at all existed between EgyptAir and plaintiff. He was not involved in the purchase of the tickets, he was not at the airport, and he had no communication of any type with EgyptAir prior to the Flight. 56.1, ¶¶ 25-31. Because no special relationship existed between EgyptAir and plaintiff, EgyptAir did not owe him any duty of care. *Pittman,* 149 F.3d at 125.

Moreover, EgyptAir did not owe a duty of care to the children to investigate to confirm that they were not being transported in violation of a custody order. *Id.*   It is undisputed that EgyptAir had no knowledge of the terms and existence of the custody order, or that plaintiff objected to the children's travel. 56.1 ¶¶ 25, 26. It also is undisputed that no federal or state statute, rule or regulation, or industry standard, exists which requires a commercial air carrier transporting an adult and child traveling together to investigate and confirm whether a custody order exists with respect to the child, the contents of that order, or whether a non-traveling parent exists and consents to the travel. *Id.*, ¶¶ 55-61. Accordingly, EgyptAir did not breach any duty to the children.

Similarly, the "circumstances" surrounding the travel of El-Nady and her children did not impose on EgyptAir a duty to investigate the possibility that a crime was in progress. Plaintiff's unilateral, self-serving characterization of those circumstances as "out-of-the-ordinary" cannot overcome the record evidence that establishes just the opposite – that the activity at the EgyptAir counter was completely normal and routine.  *Id.*, ¶¶ 35-64.

Plaintiff claims that the following circumstances should have indicated to EgyptAir that a crime was taking place: (1) El-Nady was traveling with her children "without a man"; (2) she used cash to purchase the tickets for same day travel without advance reservations; (3) she purchased business class tickets instead of economy class tickets; (4) she and her children had

different last names in their Egyptian passports; (5) the children's Egyptian passports did not contain entry visas showing their entry into the U.S.; (6) El-Nady did not use a dual parental consent form or present other evidence at the time of check-in that plaintiff consented to the children's travel; and (7) travel to Egypt involves some "particular risk" of child abduction. *See* Amended Complaint, ¶¶ 13 – 22.

EgyptAir operates a flight from New York to Cairo every day. 56.1, ¶ 2. The vast majority of its passengers are Egyptian citizens traveling with Egyptian passports. *Id.*, ¶ 39. On every flight there is at least one passenger group consisting of an adult female and a minor child unaccompanied by "a man." *Id.*, ¶ 40. For almost two years leading up to the subject flight, EgyptAir sold, on average, more than 30 tickets per month at the airport – or one every single day. *Id.*, ¶¶ 41-42. All of these tickets were purchased without advance reservations, and were for travel the same day of the purchase. *Id.*, ¶ 41. EgyptAir's passengers routinely use cash to pay for these tickets (as well as excess baggage fees).  In fact, EgyptAir's records establish that cash is used 45% of the time to buy tickets sold at the airport. *Id.*, ¶ 44.  These same records establish that more than half of these tickets were for one-way travel from New York to Cairo. *Id.*, ¶¶ 45-46.

Accordingly, the evidence establishes that for almost two years before El-Nady's travel with her children, virtually every afternoon a person walked up to the EgyptAir ticket counter, bought a ticket (usually with an Egyptian passport), and flew to Egypt.  Moreover, just under half of these tickets were paid for in cash, and just over half were for one-way travel.  If these circumstances "indicate" anything about a passenger who travels this way, it is that he or she decided to make a trip home on short notice. Not surprisingly, the Egyptian population in the

United States routinely turns to EgyptAir, the national carrier of Egypt, for last minute, emergency-type travel home for family events such as deaths and illnesses. *Id*., ¶ 47.

Although El-Nady elected to travel in the business class cabin, her decision to do so signals nothing more than that she could afford it and was willing to pay for the added comfort. It is undisputed that she had the option of buying economy class tickets on the Flight. *Id*., ¶ 38. The fact that she chose to sit up front did not in any way evidence criminal activity, and certainly would not have indicated any greater sense of "urgency" to leave the country than if she had elected to save some money and sit a few rows back in the same plane.

Similarly, the fact that El-Nady and her children had different last names in their Egyptian passports was meaningless because the vast majority of EgyptAir's passengers travel with Egyptian passports, and every Egyptian mother and child that EgyptAir transports have different last names in their Egyptian passports. *Id*., ¶¶ 39, 51, 52.  In fact, plaintiff and El-Nady followed this custom after they were married. *Id*., ¶ 53. The alleged absence of U.S. entry visas in the children's passports likewise is a non-issue because there was no reason for EgyptAir to check for such visas. *Id*., ¶ 54.

The fact that El-Nady did not present a "dual parental consent form" or similar document evidencing plaintiff's consent to the children's travel also is meaningless because no statute, rule or regulation requires the use of such documents, and neither EgyptAir nor any other commercial air carrier mandates the use of such documentation as part of their ticketing, check-in and boarding procedures.[9]  *Id*., ¶¶ 55, 60. The U.S. Transportation Security Administration similarly

---

[9] Such documents are used only in the limited circumstance where they are required by the laws of the country of destination for the flight.  Egypt, however, is not one of those countries.

has elected not to require such documentation. *Id.*, ¶ 60. Significantly, plaintiff himself has traveled with his children without El-Nady and did not use such forms.   *Id.*, ¶ 62.

Finally, plaintiff has produced no evidence to support his allegation that some particular risk exists that child abductors would pick Egypt as their destination as opposed to some other country.   Egypt is the only place that EgyptAir flies to from New York. *Id.*, ¶ 3.   Accordingly, the fact that a passenger purchases a ticket for a flight to Cairo hardly can be considered out of the ordinary.   Moreover, the "evidence" produced by plaintiff in support of this allegation does not in anyway support the allegation.   The Department of State's "special flyer" referred to by plaintiff in paragraph 19 of the Amended Complaint is in fact merely a general information fact sheet concerning issues faced when a child is abducted to Egypt because Egypt is not a signatory to the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction. *Id.*, ¶ 68 and Carlsen Declaration, ¶ 12 and Exhibits "J" and "K" thereto. Plaintiff failed to include the fact that the Department of State website contains an identical "special flyer" on 57 other countries that are not signatories to this treaty.   *Id.* No evidence exists that EgyptAir has ever been involved in another case involving an alleged parental abduction, or has ever even heard about such an event occurring. *Id.*, ¶¶ 69-71.

In short, plaintiff cannot create a duty just by labeling ordinary conduct as unusual.   He has produced no evidence to even suggest that the travel of El-Nady and her children was in any way suspicious.   In essence, he is claiming that the possibility of parental abductions creates a duty to investigate and vet the relationship between every adult and child traveling together.   No such duty exists.   Accordingly, because EgyptAir did not breach any duty to plaintiff or the children, all of the claims should be dismissed.

# IV

## THE CLAIM FOR INTERFERENCE
## WITH CUSTODIAL RELATIONS SHOULD BE DISMISSED

Count One asserts a claim for interference with custodial relations. This claim should be dismissed because plaintiff cannot establish that EgyptAir acted with knowledge that El-Nady was traveling with her children in violation of the terms of the custody order, or that EgyptAir acted with the intent to interfere with plaintiff's custodial rights.  "The unlawful taking or withholding of a minor child from the custody of the parent entitled to such custody is a tort." *Kajtazi v. Kajtazi*, 488 F.Supp. 15, 18 (E.D.N.Y. 1978).  "[T]hose who aid a parent in removing a child from the country *in order to frustrate* the other parent's right to custody are also liable to the injured parent. This liability rests on the long established principle that one who conspires with, or aids or abets, another to commit a tort is equally liable for the injury to the victim." *Pittman v. Grayson*, 1997 WL 370331 *4 (S.D.N.Y. July 2, 1997)(citations omitted)(emphasis added), *aff'd*, 149 F.3d 111 (2d Cir. 1998). "In order to find that [EgyptAir] … joined a conspiracy with, or aided or abetted, [El-Nady] to deprive her ex-husband of his lawful right to the custody of his child two things must be established: 1) that [EgyptAir] was aware of the wrongful nature of her conduct and 2) that [EgyptAir] performed some act to further that unlawful purpose." *Pittman v. Grayson*, 1997 WL 370331 at *4.

No evidence exists to establish that EgyptAir took or withheld the children, or that EgyptAir was aware that a custody order was being violated, or that EgyptAir performed some act in order to further El-Nady's unlawful conduct.  Accordingly, the claims in Count One should be dismissed.[10]

---

[10] Plaintiff also would not be able to establish this claim under Massachusetts law. Plaintiff did not articulate the basis for his claims in Court One. He may be referring to Restatement (Second) of Torts § 700 adopted in

**V**

**THE CLAIMS FOR NEGLIGENCE SHOULD BE DISMISSED**

Count Two assets negligence claims against EgyptAir. A negligence claim requires proof that the defendant owed a duty of care and breached that duty. *Fox v. Marshall*, 88 A.D.3d at 131. For the reasons set forth in Point III above, EgyptAir did not owe or breach any duty to plaintiff or the children. Accordingly, Count Two should be dismissed.

**VI**

**THE CLAIM FOR NEGLIGENT INFLICTION
OF EMOTIONAL DISTRESS SHOULD BE DISMISSED**

Count Four of the Amended Complaint asserts a claim on behalf of plaintiff for negligent infliction of emotional distress. Such a claim "is premised upon a breach of duty which unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for [his] safety. Under this zone-of-danger rule, a plaintiff may recover for mental anguish only if the plaintiff [himself] was in danger of bodily injury from the defendant's negligence." *Santoro v. Donnelly*, 340 F.Supp.2d 464, 491-92 (S.D.N.Y. 2004). *See also Passucci v. Home Depot, Inc.*, 67 A.D.3d 1470, 1471, 889 N.Y.S.2d 353, 355 (4th Dep't 2009). Moreover, this cause of action requires allegations "that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

---

Massachusetts in *Murphy v. I.S.K. Con. of New England, Inc.*, 409 Mass. 842, 571 N.E.2d 340 (1991), which provides: "One who with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has left [] him, is subject to liability to the parent." *Id.* at 861.   351.   This tort of "intentional interfere with the parent-child relationship" requires proof that EgyptAir acted with knowledge that plaintiff did not consent to the travel, and intended to "abduct[] or otherwise compel[] or induce[]" the children to leave him. No such proof of knowledge or intent exists in this case.

utterly intolerable in a civilized community." *Berrios v. Our Lady of Mercy Med. Ctr.*, 20 A.D.3d 361, 362 (1st Dep't 2005).

No evidence exists that plaintiff's physical safety was endangered, or that he feared for his physical safety, or that EgyptAir engaged in the requisite "atrocious" conduct.[11] Accordingly, this claim should be dismissed.

## VII

## THE CLAIM FOR LOSS OF
## FILIAL CONSORTIUM SHOULD BE DISMISSED

Count Six of the Amended Complaint asserts a claim for plaintiff for loss of filial consortium under M.G.L. c. 231 §85X.    This claim should be dismissed because plaintiff's claims are governed by New York law. Under New York law, "a parent may not recover damages for loss of consortium as a result of injuries to the child due to negligence." *Santoro v. Donnelly*, 340 F.Supp.2d 464, 492 (S.D.N.Y. 2004).[12]

---

[11] Plaintiff's claim also would have to be dismissed under Massachusetts law because he cannot prove that he suffered the requisite physical harm. In order to recover for negligently inflicted emotional distress under Massachusetts law, plaintiff must prove: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. *Payton v. Abbott Labs*, 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982). "A plaintiff is required to corroborate [his] mental distress claims with enough objective evidence of harm to convince a judge that [his] claims present a sufficient likelihood of genuineness to go to trial." Sullivan v. Boston Gas Co., 414 Mass. 129, 132, 137-138, 605 N.E.2d 805 (1993). "Physical harm to the plaintiff, manifested by objective symptomatology is a critical element of this tort." *Mercuri v. Newhouse*, 2009 WL 6361869 *8 (Mass. Sup. Oct. 30, 2009). The required objective evidence of harm does not exist in this case. 56.1, ¶ 76.

[12] This claim also cannot be sustained under the Massachusetts statute, which provides that "[t]he parents of a minor child … shall have a cause of action for loss of consortium of the child who has been *seriously injured* against any person who is legally responsible for causing such injury." *Id.* (emphasis added).  This statute was enacted in response to *Norman v. Massachusetts Bay Trasp. Auth.*, 403 Mass. 303, 529 N.E.2d 139 (1988), in which the Court refused to allow parents to recover for the loss of their injured child's consortium. *See Monahan v. Town of Methuen*, 408 Mass. 381, 388-89, 558 N.E.2d 951 (1990). The statute was changed to adopt the position articulated by the three dissenting Justices in *Norman* that a parent should have a cause of action for the loss of child's "'society and companionship when that child has been severely and permanently injured due to the defendant's negligence.'" *Monahan*, 408 Mass. at 388 (*quoting Norman*, 403 Mass. at 309).  Accordingly, recovery under this stature requires proof that the child was "seriously injured."  No such proof exists in this case. 56.1, ¶¶ 72-75.

# VIII

## THE CLAIMS FOR PUNITIVE
## DAMAGES SHOULD BE DISMISSED

Plaintiff's claims for punitive damages should be dismissed because punitive damages specifically are barred by Article 29 of the Montreal Convention. "In any …action [under the Montreal Convention], punitive, exemplary or any other non- compensatory damages shall not be recoverable." *Id.*

Punitive damages likewise are not recoverable in this action under New York law.  The imposition of punitive damages under New York law requires proof of

> conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.  … [I]t must be shown that the defendant acted with actual malice involving an intentional wrongdoing , or that such conduct amounted to a wanton, willful or reckless disregard of plaintiff's rights."  To support a finding of actual malice, there must be an evil motive on the part of the defendant such that the defendant's actions were done out of hatred, ill will, or spite for the plaintiff. … There cannot be a finding of malice under New York law unless, at a minimum, the defendant intended to harm the plaintiff.

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, ___ F.Supp.2d ___, 2011 WL 4035751 *3 (S.D.N.Y. Sept. 12, 2011)(quotations and citations omitted).[13]  For the reasons discussed under Point III, *supra*, no evidence exists in this case that would even remotely support a claim for punitive damages.

---

[13]  The result would be the same under Massachusetts law, where punitive damages cannot be awarded without "conduct that is outrageous, because of the defendant's evil motive, or his reckless indifference to the rights of others."  *Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 107, 914 N.E.2d 59, 72 (2009)(quotations and citations omitted).

## CONCLUSION

For the foregoing reasons, EgyptAir's motion for summary judgment should be granted and plaintiff's Complaint should be dismissed in its entirely.

Dated: Boston, Massachusetts
          December 14, 2011

## REQUEST FOR ORAL ARGUMENT

EgyptAir respectfully requests that the Court conduct oral argument of this motion as it believes that such argument would be helpful to an understanding of the issues presented by the motion.

    Dated: Boston, Massachusetts
    December 14, 2011

                                        Respectfully submitted,


                                        /s/Shalissa M. Dougherty
                                            Brian P. Voke (BBO#544327)
                                            Shalissa M. Dougherty (BBO# 670478)
                                        Campbell Campbell Edwards & Conroy, P.C.
                                        One Constitution Plaza
                                        Third Floor
                                        Boston, MA 02129
                                        (617) 241-3000 (ph)
                                        (617) 241-5115 (fax)

                                                -and-

                                        Christopher Carlsen
                                        Deborah A. Elsasser
                                        Clyde & Co US LLP
                                        The Chrysler Building
                                        405 Lexington Avenue
                                        New York, New York 10174
                                        (212) 710-3900 (ph)
                                        (212) 710-3950 (fax)

                                        Attorneys for Defendant
                                        EGYPTAIR AIRLINES COMPANY, incorrectly
                                        named as EGYPTAIR AIRLINES

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 14, 2011, a copy of the foregoing document was served upon the following attorneys of record via the court's ECF system:

Barry S. Pollack
Joshua L. Solomon
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800 (ph)
(617) 338-2880 (fax)

Howard M. Cooper
TODD & WELD LLP
28 State Street
Boston, MA  02109
(617) 720-2626 (ph)
(617) 227-5777 (fax)

    /s/ Shalissa M. Dougherty_____
Shalissa M. Dougherty