UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10405-RGS

COLIN BOWER, on his own behalf
and on behalf of his minor children, N and R

v.

MIRVAT EL-NADY,
and EGYPTAIR AIRLINES

MEMORANDUM AND ORDER ON DEFENDANT
EGYPTAIR AIRLINES' MOTION
FOR SUMMARY JUDGMENT

March 21, 2012

STEARNS, D.J.

Plaintiff Colin Bower brought this action on his own behalf and in his capacity

as the guardian of his two minor children after his former wife, defendant Mirvat El-

Nady, fled to Cairo, Egypt, in August of 2009, taking the children with her without his

consent and in violation of a Massachusetts court order granting custody to Bower.

This decision does not affect the validity of the custody order, or the criminal

prosecution of Mirvat El-Nady. Rather, it involves a related but separate claim against

defendant EgyptAir, the airline on which El-Nady flew with her children from New

York to Cairo. Bower alleges that EgyptAir should have refused passage to El-Nady

and the children, and by failing to do so is liable for interference with his custodial

relations, negligence, negligent infliction of emotional distress, and loss of filial consortium.

PROCEDURAL BACKGROUND

On February 5, 2010, Bower brought this action in the Massachusetts Superior Court. On March 8, 2010, EgyptAir removed the case to the federal district court on both diversity and preemption grounds. After the removal, Bower filed an Amended Complaint on March 12, 2010. The case was assigned to Judge Gertner. On June 18, 2010, EgyptAir filed a motion to dismiss for lack of personal jurisdiction, or, in the alternative, to dismiss or transfer venue to New York pursuant to 28 U.S.C. § 1406(a) or § 1404(a). A number of jurisdictional discovery motions ensued, including motions to compel the deposition testimony of Bruce Bower (Colin Bower's father), a motion to compel Michael Traft, El-Nady's attorney, to respond to a subpoena for an in camera inspection by the court of a privilege log and retention agreement with El-Nady, as well as motions to quash various subpoenas to third-parties. The resolution of these motions was referred by Judge Gertner to Magistrate Judge Dein. On March 29, 2011, Judge Gertner adopted a Report and Recommendation that she deny EgyptAir's motion to dismiss.[1]

_____

[1] On June 16, 2011, Magistrate Judge Dein, in a separate decision, denied Bower's motion for relief based on EgyptAir's alleged discovery violations.

2

On September 23, 2011, following Judge Gertner's retirement, the case was assigned to this session. On February 21, 2012, the court resolved a subject matter jurisdiction dispute among the parties, finding the existence of diversity jurisdiction pursuant to 28 U.S.C. § 1332. *See Bower v. El-Nady*, --- F. Supp. 2d ----, 2012 WL 542589 (D. Mass. Feb. 21, 2012). Presently before the court is EgyptAir's motion for summary judgment. The court heard oral argument on March 1, 2012. Neither El-Nady nor her representative appeared at the hearing.

## FACTUAL BACKGROUND

The facts, in the light most favorable to Bower as the nonmoving party, are as follows.[2] El-Nady, an Egyptian citizen, and Bower, a United States citizen, met in Cairo, Egypt, and were married there in 1998. They later moved to London, where their two sons, N and R, were born. The children are citizens of both the United Kingdom and the United States.[3] In 2005, the family moved to Massachusetts, but by December of 2008, the marriage had deteriorated into a divorce. Bower was given sole legal custody of the children, but shared physical custody with his ex-wife. Judgment of Divorce ¶ 1. Under the terms of the divorce decree, El-Nady was not permitted to

---

[2] *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993).

[3] Under a 2004 change in Egyptian law, the children are also eligible to become citizens of Egypt.

take the children out of Massachusetts.  *Id.* ¶ 8.  Between December of 2008 and August of 2009, El-Nady lived in an apartment in Newton and the children attended private school in Boston.

On August 11, 2009, during a scheduled multi-day visit, El-Nady drove the children to John F. Kennedy International Airport (JFK) in New York and purchased three one-way business-class tickets to Cairo on a departing EgyptAir flight.  Am. Compl. ¶ 11.  El-Nady paid for the tickets, which cost nearly $10,000, with cash. Statement of Facts (SOF) ¶¶ 34-35, 38, 84.[4]  El-Nady produced her own Egyptian passport, as well as Egyptian passports for N and R.  SOF ¶ 36.  The last name on her passport – El-Nady – differed from the name on her sons' passports.[5]  *Id.*  Bower contends that he had no knowledge that his sons had been issued Egyptian passports and that he had never consented to the issuance.[6]  *Id*. ¶ 37.

EgyptAir did not examine the children's passports for prior entry visas to the

---

[4] Bower responded to EgyptAir's statement of facts using the same paragraph numbers.  *See* Dkt # 150 & # 162.

[5] The boys' passports listed their last name as "Power" instead of "Bower."

[6] EgyptAir maintains that the passports appeared facially valid.  *Id.* ¶ 37, citing Helmi Decl.  ¶ 10.

United States, nor were there any.[7]  *Id.* ¶¶ 34, 87.  Bower asserts that EgyptAir also

failed to request I-94 forms from El-Nady for herself and the children.[8] *Id.* ¶ 88.

On August 16, 2009, Bower discovered that the children were missing and filed

a police report.  As a result, El-Nady was charged with both state and federal criminal

kidnapping offenses.  Am. Compl. ¶¶ 7, 24.  Since August of 2009, Bower has seen his

children four times.  SOF ¶ 80.  Each of the visits took place in Cairo and were

arranged through the United States Embassy; the visits were supervised by El-Nady

and members of her family.  *Id.*  During the visits, Bower observed a "shift in the

behavior of his children reflecting serious psychological injury and trauma" and that

"both boys appeared physically unhealthy."  *Id.* ¶ 103.  Bower alleges that he has

---

[7] EgyptAir states that when a passenger flies from New York to Cairo with an Egyptian passport, his or her passport is not checked for the presence of an entry visa issued by either the United States or Egypt.  "An Egyptian citizen is not required to have a visa to enter Egypt, and a United States entry visa is not required in order for a passenger to travel out of the United States." *Id.* ¶ 54.

[8] A Form I-94 is an arrival/departure record submitted by non-U.S. citizens traveling to and from the United States.  As a general rule, a non-citizen who is not a permanent resident of the United States is required to surrender the Form upon departing from the United States.  In addition, an airline "departing from the United States to any place outside the United States must present a properly completed departure portion of an Arrival/Departure Record, Form I-94, to the Customs and Border Protection (CBP) officer at the port of departure for each person on board. Whenever possible, the departure Form I-94 presented must be the same form given to the alien at the time of arrival in the United States. The carrier must endorse the I-94 with the departure information on the reverse of the form . . . ." 8 C.F.R. § 231.2(b).

personally suffered "intense emotional distress which has been accompanied by physical manifestations including headaches, stomachaches, loss of sleep, scabs on his scalp, loss of hair, and heart palpitations." *Id.*

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). Rule 56 "mandates the entry of summary judgment . . . upon motion against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The nub of Bower's case against EgyptAir is the allegation that the airline "failed to use any reasonable pre-embarkation safeguards to protect against the use of its services by a customer to abduct children." Am. Compl. ¶ 15. Bower alleges that "[t]he circumstances surrounding the pre-embarkation arrangements for the unlawful flight provided reasons for EgyptAir to know that N and R were being transported out of the United States and to Egypt without the consent of their custodial father. Yet EgyptAir failed to act on these circumstances and instead facilitated the travel arrangements necessary for El-Nady to abduct the children." *Id.* ¶ 22. Moreover, "EgyptAir knew or should have known of the particular risk of child abductions to Egypt because of the difficulty in apprehending abductors in and recovering children kidnapped to Egypt." *Id.* ¶ 19.

For its part, EgyptAir asserts that it owed Bower no duty to investigate whether a citizen of Egypt, traveling to Cairo with her children (both of whom appeared to have valid Egyptian passports and who showed no signs of distress), was in fact doing so in violation of a court order. EgyptAir contends that the "red flags" to which Bower refers – principally El-Nady's use of cash to buy expensive same-day one-way tickets to Cairo – would not have alerted it to a parental child abduction. Because it owed

Bower no legal duty, EgyptAir maintains that Bower cannot succeed on any of his claims.[9]

### *Preemption by the Airline Deregulation Act and/or The Warsaw Convention, as amended by the Montreal Agreement*

As a preliminary matter, EgyptAir asserts that Bower's common-law tort claims are preempted by the Airline Deregulation Act (ADA), which prohibits any state from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . ." 49 U.S.C. § 41713(b)(1). On this issue, the court disagrees. Even accepting the proposition that the ticketing and checking-in of passengers are "services," that determination does not conclude the matter. "The ADA does not preempt *all* claims arising from an airline service, but only those arising under state laws that are 'related to' that service." *Gill v. JetBlue Airways Corp.*, --- F. Supp. 2d ----, 2011 WL 6258518, at *6 (D. Mass. Dec. 14, 2011). "[I]n cases involving personal injury, courts have generally held that negligence claims were not preempted by the ADA on the grounds that the enforcement

---

[9] EgyptAir argues, although not strenuously, that New York law should govern the resolution of the common-law claims. For purposes of this motion, the court will assume that Massachusetts law applies, as it would appear that Massachusetts has a greater interest in punishing the violation of an order of its courts than does New York in policing the conduct of international air carriers providing service to JFK. In any event, the ultimate decision does not turn on the choice of law.

of tort remedies is not sufficiently 'related to' airline services." *Id.*, at *7 (omitting cited cases).

These holdings are consistent with the Congressional intent – "the ultimate touchstone of pre-emption analysis" – underlying the ADA. *Id.*, at *3, quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). *See also Margolis v. United Airlines, Inc.*, 811 F. Supp. 318, 321 (E. D. Mich. 1993). "Congress enacted this [preemption] provision 'to ensure that the States would not undo federal deregulation with regulation of their own.'" *Gill*, 2011 WL 6258518, at *3, quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). "There is little reason to believe that the clause was intended to extend to personal injury actions, which were not the subject of federal regulation in the first place." *Gill*, 2011 WL 6258518, at *7.

EgyptAir points the court to a recent opinion of Judge Wu in the Central District of California, *Ko v. Eva Airways Corp.*, No. 11-cv-05995-GW (Feb. 13, 2012), which presented a nearly identical set of facts.[10] Judge Wu held that the father's claims of negligence were preempted by the ADA because "[i]t is not so clear to this Court that effectively imposing on airlines operating in California the obligation to perform certain

_____

[10] In *Ko*, a mother took her children from California to Singapore without the consent of the father, who shared custody with his ex-wife.

measures to determine the proper custodial status of children traveling with only one adult would not 'adversely affect the economic deregulation of the airlines and the forces of competition within the airline industry.'" *Id.* at 10, quoting *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261 (9th Cir. 1998).

Although Judge Wu's opinion is well reasoned, to my mind the negligence claims asserted by Bower more closely resemble tort claims related to passenger safety (claims that all courts agree are not preempted by the ADA) than they do state regulatory actions that might have a significant impact on airline competition in a deregulated market. *Cf. Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370-371 (2008), citing *Morales,* 504 U.S. at 378 (noting that the preemption provision of the ADA, as in the 1994 Act governing the deregulation of trucking, had as its focus state enforcement actions impacting the federal regulatory regime). *See also Sedigh v. Delta Airlines, Inc.*, 850 F. Supp. 197, 200, 201 (E.D.N.Y. 1994) ("Most district courts have found broad preemption inappropriate in 'services' cases."); *Hodges v. Delta Airlines, Inc.*, 4 F.3d 350, 355 (5th Cir. 1993) ("If liability for personal injuries were preempted, such insurance would hardly be necessary, because there is no federal compensation scheme for injuries to airline passengers.").

The thrust of Bower's claims is that EgyptAir "employees breached a standard of care imposed on society as a whole (or, at least, one imposed on all common

carriers).” *Gill*, 2011 WL 6258518, at *7. It is true that if Bower were to succeed on his claims, the result might have an incidental impact on the handling of the sale of over-the-counter tickets to single parents traveling with minor children. But because the impact would be a generalized one affecting all carriers, it is difficult to imagine why any one airline would be put at a competitive disadvantage with others subject to the same rules. *See id.* (“This generalized duty of care [to accommodate disabled passengers in the boarding of an aircraft] is therefore unlike the consumer-protection statutes held preempted in *Morales* and [*American Airlines, Inc. v.*] *Wolens*, [513 U.S. 219 (1995)], which require courts to play a quasi-regulatory role by adapting statutory standards for trade practices to the particular practices of the airline industry.”).

I am similarly unpersuaded by EgyptAir’s argument that Bower’s claims are preempted by the Warsaw Convention, as amended by the Montreal Agreement. *See Acevedo-Reinoso v. Iberia Lineas Aereas de Espana S.A.*, 449 F.3d 7, 11 n.4 (1st Cir. 2006). The Warsaw Convention “governs the liability of international air carriers for passenger injuries occurring ‘on board the aircraft or in the course of any of the operations of embarking or disembarking.’” *Id.* at 11, quoting *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 172 (1999). “The Convention is preemptive: a carrier is not subject to liability under local law for passenger injuries ‘covered by’ the Convention.” *Acevedo-Reinoso*, 449 F.3d at 11 (citing Warsaw Convention Article

17).

"[T]he language of Article 17 – which speaks to accidents that occur 'in the course of any of the operations of embarking'– strongly suggests that there must be a tight tie between an accident and the physical act of entering an aircraft." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 317 (1st Cir. 1995) (citations omitted). A ticket transaction is by definition both "spatially and temporally" distinct from the act of embarking (or disembarking) an airplane. While the purchase of a ticket is a condition precedent to accessing a commercial flight, there is no rule that the ticket be bought in person or at a physical location (most tickets are today purchased over the Internet), or that it be purchased in temporal proximity to the flight (most airlines will sell tickets as much as a year in advance). While the transaction here occurred at a ticket counter at JFK, the counter salesperson had no more relationship to El-Nady's and the children's physical act of boarding the aircraft than did the taxi driver who presumably ferried them to the terminal or the porter who presumably checked their luggage.[11] And the omission of which Bower complains, the failure to verify whether

---

[11] As *McCarthy* explains, courts use a three-pronged approach to interpret the term "embarking." "The inquiry focuses on (1) the passenger's activity at the time of injury, (2) his or her whereabouts when injured, and (3) the extent to which the carrier was exercising control at the moment of injury." *Id.* The ticketing salesperson has no control over whether a would-be passenger will ultimately be permitted to board the plane; that authority lies in the crew's discretion, with sole final authority resting with

12

El-Nady was violating a court order by taking the children out of the country with her, was complete at the time the tickets were sold, which was well before the flight began to board. Because the purchase of an airplane ticket is clearly not within the scope of Article 17 preemption, EgyptAir "is indisputably subject to liability [if at all] under local law for injuries arising outside of that scope: *e.g.*, for passenger injuries occurring before any of the operations of embarking or disembarking." *Acevedo-Reinoso*, 449 F.3d at 11.

### Interference with Bower's Custodial Relations

"'The common law has traditionally recognized a parent's interest in freedom from tortious conduct harming his relationship with his child,' and the parent 'may be compensated therefor when there is interference with the normal parent-child relationship.'" *Murphy v. I.S.K. Con. of New England, Inc.*, 409 Mass. 842, 859-860 (1991) (internal citations omitted). The Supreme Judicial Court (SJC) of Massachusetts "acknowledge[s] the tort of *intentional* interference with the parent-child relationship as a contemporary expression encompassing actions for abduction, enticement, harboring, and secreting of a minor child from the parent having legal custody." *Id*. at 861 (emphasis added).

The SJC has made clear that the tort has as its first premise the requirement of

the plane's captain.

knowledge on the part of a defendant that the custodial parent has not consented to the alleged interference. *See id.* Under no reasonable view of the facts could EgyptAir be said to have had actual knowledge of El-Nady's abduction scheme when it sold her the tickets and permitted her to board the aircraft with her children. Nor could it have known that Bower – the custodial parent – had not consented to the children's travel. SOF ¶¶ 25-31. Bower has alleged no facts even hinting otherwise.[12]

*Negligence*

Bower alleges more plausibly in the second count of the Complaint that "[a]s a result of agreeing to transport and facilitating the transportation of N and R, EgyptAir owed legal duties to Bower, N and R to exercise reasonable care to protect N and R from, among other things, being wrongfully removed from the United States without the consent of their custodial father. As an international carrier transporting minors, EgyptAir owed duties to them and to Bower, their non-passenger parent." Am. Compl. ¶ 34.

Non-passenger parents are foreseeable victims of international child

---

[12] Bower asserts that EgyptAir did in fact *know* that "it had received no consent from the father" and was aware of the "many flags of suspicious behavior." Bower Opp'n at 28. The assertion, however, makes no sense. EgyptAir knew no more about whether Bower consented to the children's travel than whether N and R even had a living father. Even assuming for the moment that the "flags of suspicious behavior" were auspicious, Bower cannot plausibly refute EgpytAir's argument that "flags of suspicion" do not equate to actual *knowledge* that an *abduction* was underway.

abductions to air carriers that fly internationally, particularly to Egypt. The foreseeability of the abductions at issue here was heightened by the specific circumstances surrounding El-Nady's purchase of tickets from and presentation of documents to EgyptAir. By facilitating international travel for N and R without consent from their father, who did not accompany them, EgyptAir breached the duties of care it owed to Bower. Its breaches in this regard constituted negligence.

*Id.* ¶ 35.

Common-law negligence in Massachusetts consists of the breach of a duty of care that directly and proximately causes harm to a plaintiff. Whether a person owes a duty to another (a prerequisite for a finding of negligence) is a question of law. *Leavitt v. Brockton Hosp., Inc.*, 454 Mass. 37, 40 (2009). *See also Brown v. United States*, 514 F. Supp. 2d 146, 152 (D. Mass. 2007). "The concept of 'duty' . . . 'is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.'" *Luoni v. Berube*, 431 Mass. 729, 735 (2000), quoting Prosser & Keeton on Torts § 53 at 358-359 (5th ed. 1984).

### Duty Owed to Bower

The essential question is whether EgyptAir owed a legal duty to Bower to investigate the possibility that two minor children traveling with their mother on an

international flight to her country of origin were the subject of a United States court order granting custody to an absent and unknown father. If EgyptAir had such a duty, and failed to act on it, then liability on the part of EgyptAir for negligence might well follow. "Generally speaking, [however,] a defendant's duty is more limited when negligence consists of an omission rather than an act of commission.[13] . . . So too, as a general matter, '[t]here is no duty . . . to control the conduct of a third person as to prevent him from causing physical harm to another.'" *McCloskey v. Mueller*, 446 F.3d 262, 267 (1st Cir. 2006), quoting Restatement (Second) of Torts § 315 (1965).[14] There are two exceptions to this general rule. First, a duty may arise when "a special relation exists between the actor and the [plaintiff] which gives [the plaintiff] a right to protection." *Id.* at 268 (citations omitted). "The second exception arises when 'a

---

[13] Bower attempts to re-label EgyptAir's negligence as malfeasance rather than nonfeasance by arguing that EgyptAir facilitated the abduction by providing the mode of transportation. This is a damp squib. EgyptAir can only be negligent if it breached a duty, and the breach caused a proximate harm. Here, the alleged breach is the failure to deploy safeguards – such as dual consent forms – that might have given EgyptAir reason to believe that a mother was traveling without her ex-husband's permission and that her children were the subject of a court order giving legal custody to the father. The alleged failure fits the classical definition of nonfeasance – inaction that results in harm to another. Malfeasance, on the other hand, is the doing of an act which is positively unlawful and wrongful. There is nothing unlawful about failing to require a dual consent form before allowing a single parent to board an airplane with his or her children.

[14] "Massachusetts courts have recognized the generic applicability of relevant Restatement of Torts principles" to a duty analysis. *McCloskey*, 446 F.3d at 267.

special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.'" *Id.*

The first exception is plainly inapplicable, as Bower and EgyptAir had no special relationship (or, for that matter, any relationship whatsoever). Nor is the second exception relevant as it applies only to three specific relationships: "parent and dependent children, master and servant, and possessor of land or chattels and licensee – none of which is applicable here." *See Leavitt*, 454 Mass. at 44 n.9. "In the absence of a special relationship sufficient to trigger one of these exceptions, a private party is not liable for failing, either intentionally or inadvertently, to exercise control over the actions of a third party so as to protect others from harm. . . . This is so even if the prospective harm is substantial and 'the actor realizes that he has the ability to control the conduct of [the] third person, and could do so with only the most trivial of efforts.'" *McCloskey*, 446 F.3d at 268 (citations omitted).[15]

---

[15] Bower maintains that *Stanford v. Kuwait Airways Corp.*, 1992 WL 295978 (S.D.N.Y. Oct. 6, 1992), establishes an exception to this otherwise settled statement of law. In *Stanford*, the issue was whether Middle East Airliban, S.A. (MEA) "owed the [plaintiff-passengers] a duty of care to screen passengers boarding and deplaning from MEA interline flights" after armed highjackers traveling on an MEA flight transferred to a Kuwait Airways Corp. (KAC) plane. *Id.*, at *2. The court held that MEA owed a duty of care to the KAC passengers who were killed or injured during the subsequent highjacking because "MEA should have recognized that security measures were necessary for the protection of passengers boarding connecting flights." *Id.*, at *3. The facts in *Stanford* bear no resemblance to those here. In *Stanford*, the court found

### Duty Owed to N and R

That EgyptAir and the children were in a special relationship is not a matter of dispute. Under Massachusetts law "[a] common carrier 'is required to exercise the utmost care consistent with the nature and extent of its business to carry its passengers to their destination in security and enable them to alight there with safety.'" *Commerce Ins. Co. v. Ultimate Livery Serv., Inc.*, 452 Mass. 639, 641 n.4 (2008), quoting *Glennen v. Boston Elevated Ry.*, 207 Mass. 497, 498 (1911).[16] Once a special relationship is imposed by law, the scope of the duty owed is a function of the foreseeability of the given harm. *Cf. McCloskey*, 446 F.3d at 469 n.8. *See also Brown*, 514 F. Supp. 2d at 152-153, citing Restatement (Second) of Torts § 302 cmt. a (1965). "[T]he carrier is not an insurer of the safety of its passengers, nor is it obliged by law

_____

that MEA had failed "to maintain operational x-ray devices, metal detectors, etc.," *id.*, despite widespread terrorist activity, much of which was centered in Beirut (where the MEA flight originated) and which had the pirating of airplanes as one of its principal objects. The foreseeable risk and the need to screen passengers prior to boarding as a precaution against terrorist violence was in the circumstances of *Stanford* a far cry from any need to guard against a violation of a court order.

[16] The Restatement of Torts, which Massachusetts has adopted, states: "(1) A common carrier is under a duty to its passengers to take reasonable action (a) to protect them against unreasonable risk of physical harm, and (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others." Restatement (Second) of Torts § 314A (1965).

to foresee and to guard against unlikely dangers and improbable harms. *Isenberg v. New York, N. H. & H. R. Co.*, 221 Mass. 182, 183 [1915]; *Sack v. Dir. Gen. of R.R.*, 245 Mass. 114, 139 [1923]; *Pearson v. Dir. Gen. of R.R.*, 245 Mass. 158, [1923]." *Quigley v. Wilson Line of Mass., Inc.*, 338 Mass. 125, 128 (1958).

"In deciding the [duty] question, [the court will] take into account social conditions and contemporary public policy concerns." *Commerce Ins. Co.*, 452 Mass. at 646, citing *Jupin v. Kask*, 447 Mass. 141, 146-147 (2006).

> A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor. *See Foley v. Boston Hous. Auth.*, 407 Mass. 640, 646 (1990), quoting *Husband v. Dubose*, 26 Mass. App. Ct. 667, 669 (1988) ("There is no duty owed when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant"). *See also Husband*, [26 Mass. App. Ct. at 669] (determination whether person has duty to protect another from harm caused by third party "involve[s], to some extent, the foreseeability of the harm.").

*Jupin*, 447 Mass. at 147.

Bower contends that El-Nady's abduction of the children was foreseeable by EgyptAir because: (1) aspects of her behavior prior to the flight should have been recognized as "red flags" of suspicion; (2) the U.S. State Department, the U.S. CBP, and airline associations had issued bulletins warning of international parental kidnappings; and (3) dual-parental consent forms were provided by some airlines and required upon arrival in some countries (although not Egypt or the United States).

Among the "red flags" cited by Bower are: (1) El-Nady's purchase of the tickets with cash; (2) the ticket purchase was made for same-day travel; (3) the children's passports listed a different family name; and (4) El-Nady was traveling without a male companion.[17]

Taken singly or as a whole, these supposed "red flags" fell well short of giving EgyptAir a warning of the possibility that a parental child abduction was afoot. As EgyptAir points out, the purchase of same-day travel tickets with cash is not an uncommon event given the Egyptian custom of conducting business in cash.[18] SOF ¶¶

---

[17] Bower suggests that the failure of El-Nady to produce a Form I-94 should have been regarded by EgyptAir as an additional "red flag." In the first place, the Form I-94 is meant to assist immigration officials in tracking the comings and goings of non-resident foreign visitors to the United States, and not to prevent international parental child abductions. *See Roberts v. Southwick*, 415 Mass. 465, 475-476 (1993) (O'Connor, J. concurring) ("A statute, ordinance, or regulation 'is evidence of negligence on the part of a violator as to all consequences that the statute, ordinance or regulation was intended to prevent.'") (citation omitted). Nor is it mandatory, as Bower implies, that the same form issued on arrival be produced at departure. *See* 8 C.F.R. § 231.2(b) ("*Whenever possible*, the departure Form I-94 presented must be the same form given to the alien at the time of arrival in the United States.") (emphasis added). Even if EgyptAir had requested a Form I-94 from El-Nady, her failure to produce one would merely have led to her being asked to fill out a substitute Form I-94 before boarding.

[18] EgyptAir contends that "[p]laintiff cannot challenge the fact that at least one 'emergency' ticket for same day travel to Cairo is sold by EgyptAir at JFK Airport every day . . . that none of these tickets are purchased with advance reservations, that they frequently are for one-way travel, and that almost half of them are paid for in cash." EgyptAir's Reply at 17, citing SOF ¶¶ 41-47.

40-50. Similarly, the fact that El-Nady's last name differed from the last name of her children was not all that unusual given what EgyptAir asserts is a custom among Egyptian women of keeping their family name while giving the children the family name of the father. *See* SOF ¶¶ 39, 40, 51-53. Although Bower disputes the prevalence of this custom, I need go no further than to note that numerous professional women in the United States (who earn enough money to purchase international business class tickets without raising eyebrows) now keep their "maiden" names for business or personal reasons.

American society is also well past the point of looking askance at a woman traveling with her children unaccompanied by a husband or male relative.[19] This point is important as legal duties are by and large based on "the great significance given to widely shared social expectations," as Justice Souter explained in assessing third-party consent under the Fourth Amendment in *Georgia v. Randolph*, 547 U.S. 103, 111 (2006). *See also Cremins v. Clancy*, 415 Mass. 289, 292 (1993) (legal duties should reflect "existing social values and customs and appropriate social policy"); *Juliano v. Simpson*, 461 Mass. 527, 537 (2012), quoting *Remy v. MacDonald*, 440 Mass. 675,

---

[19] As EgyptAir points out, Bower admits that on occasion he traveled internationally with the two boys unaccompanied by El-Nady, and without carrying a parental consent form signed by her. SOF ¶ 62.

678 (2004) ("[W]e are reluctant to impose a duty of care in the absence of 'clear existing social values and customs' supporting such a step."). It is doubtful that Americans would be prepared to accept a court-imposed duty that – however laudable its goal – had the effect of diminishing the social freedoms of women, and particularly those who are single parents.[20]

As a fallback, Bower asserts that the risk of an international parental kidnapping by El-Nady was foreseeable because "Egypt is not a signatory to the Hague Convention on the International Aspects of Child Abductions, enhancing the risk of child abductions to Egypt due to the difficulty in apprehending abductors in and recovering children kidnapped to Egypt." Bower Opp'n at 4. Bower further contends that because the State Department's website posts information explaining "how the ease of international travel has contributed substantially to the growing problem of abductions," EgyptAir should have known of the special risk of harm to its child passengers (and the left-behind parent).[21] *Id.* EgyptAir counters that not only Egypt but fifty-seven other

---

[20] In 2009, out of 11.6 million single parents living with their children in the United States, 9.9 million were single mothers. *See* America's Families and Living Arrangements: 2009.
http://www.census.gov/population/www/socdemo/hh-fam/cps2009.htmsingle parents

[21] Bower also argues that "a high-profile international abduction to Egypt out of Connecticut highlighted the risk of child abductions to Egypt and underscored the seriousness of such matters for international carriers." *Id.* at 5. The "high-profile" case to which Bower refers is *Streeter v. Executive Jet Management*, 2005 WL 4357633

countries are also not party to the Hague Convention and that the State Department's website contains substantially identical comments about all fifty-eight.[22]

However, even assuming that these warnings were sufficient to put international air carriers in general on notice of the risk of parental child abductions, Bower has still failed to point to any specific reason why EgyptAir should have anticipated that El-Nady posed a risk of harm to her children. In *Leavitt*, the SJC distinguished the duty of care owed by a licensed commercial establishment to an intoxicated patron from the facts presented. In that case, a medicated patient was permitted to leave a hospital

---

(Conn. Super. Nov. 10, 2005). In that case, a father hired a privately chartered airliner operated by Executive Jet Management (EJM) to take his Massachusetts-domiciled children from Connecticut to Egypt without the mother's consent. EJM's employees or agents made special arrangements with the father for the flight on less than thirty hours notice. The request for one-way international service was almost unheard of by EJM, and the bill for the flight to Egypt amounted to $160,000. Of the total charge, $15,000 was billed to the limit of the father's credit card, while the rest was sent by a wire transfer. The company failed to abide by its standard procedure when receiving payment by wire, which required gathering information about the source of the funding prior to the flight. The company also failed to abide by the charter industry's "Know Your Customer" rule, which included taking precautionary measures when booking a flight for a new (or "pop-up") customer such as determining "whether the potential client was 'established' by inquiring whether he owned a home, had a bank account, etc." *Id.*, at *5. Finally, EJM made a point of marketing the "privacy" and "discretion" of its service, which provided reason enough to expect it to undertake a modicum of precautionary monitoring of its customers. *Id.*, at *6. Under the circumstances, it was not unreasonable for the court to charge EJM with constructive knowledge of the father's illegal conduct.

[22] EgyptAir also notes that the State Department advisory makes no special mention of air travel.

unaccompanied and was subsequently struck by a car.  In responding to the accident scene, the plaintiff police officer was injured when his cruiser collided with another vehicle.  The Court observed that

> [i]n a negligence case against a tavern owner or bartender, liability is premised on a defendant's failure to refrain from serving liquor to an intoxicated patron in circumstances (a) in which the defendant should have known that the patron was intoxicated and (b) where the patron's subsequent operation of a motor vehicle was reasonably foreseeable. *See, e.g., Cimino v. Milford Keg, Inc.*, 385 Mass. 323, 331-332 & n. 9 [] (1982). Liability is not premised on a tavern owner or bartender's "discharg[ing]" an intoxicated person "onto the roadway." *See O'Gorman v. Antonio Rubinaccio & Sons*, 408 Mass. 758, 761-762 [] (1990).

454 Mass. at 44 n.13.  The analogy is instructive.  EgyptAir had no more reason to anticipate that by permitting El-Nady to board the plane harm might come to the children than the hospital in *Leavitt* had reason to anticipate the officer's injury.

Bower also contends that EgyptAir should have been aware of the risk of child abductions because CBP[23] and the National Air Transportation Association (NATA)

---

[23] "Due to the increasing incidents of child abduction in disputed custody cases and as possible victims of child pornography, [CBP] strongly recommends that unless the child is accompanied by both parents, the adult have a note from the child's other parent (or, in the case of a child traveling with grandparents, uncles or aunts, sisters or brothers, or friends, a note signed by both parents) stating 'I acknowledge that my wife/husband/etc. is traveling out of the country with my son/daughter.  He/she/They has/have my permission to do so.' . . . Adults traveling with children should also be aware that, while the U.S. does not require this documentation, many other countries do . . . ." CBP Information, Bower Opp'n, Ex. K.

recommend that travelers take certain precautions when traveling with children. EgyptAir points out that the CBP recommendations cited by Bower come from "The Frequently Asked Questions Page" on the CBP website, and are directed to *passengers*, not commercial airlines. The purpose is to ensure that single American parents are not embarrassed or frustrated when attempting to enter a foreign country with their children. NATA recommendations similarly carry little weight as NATA is a non-airline trade group.[24] Even if employees of Swissport (a member of NATA), who worked at EgyptAir's ticketing counter, were aware of the NATA recommendation, Bower's contention is that EgyptAir, not Swissport, was legally responsible for the passengers on the New York-to-Cairo flight. He has not alleged that any

---

[24] "This guide will assist NATA members in developing their own policy for transporting minors internationally. . . . If a minor child is traveling with only one parent (or legal guardian), the association recommends requiring a notarized consent from the absent parent/guardian before transporting the minor over international borders. The consent form should include the traveling parent's name, country of origin and destination, dates of travel, and contact information for the non-traveling parent. If only one parent has legal custody, that parent should be prepared to provide a court order of child custody. . . . Although some countries do not require these documents for entry, and they are not necessarily required for departures from the United States, the association recommends following these guidelines for all international travel with minors to guard against legal action resulting from the transportation of minors." NATA's Guide for International Transportation of Minors, Bower Opp'n, Ex. L. EgyptAir is not a member of NATA, as NATA does not represent airlines. Swissport, the service provider EgyptAir employed to staff the ticket counter and check-in desk for El-Nady's flight, is a member of NATA. SOF ¶¶ 4, 82, 96.

recommendation directed to Swissport is applicable, or was even made known to EgyptAir.[25]

Finally, Bower urges the court to find that because dual consent forms are a reasonable precaution, are used by some airlines[26] and required by some countries, and because they *may* sometime in the future be required by the United States, EgyptAir had a duty to require them of parents traveling alone with children.[27]  It is not the role of a federal district court to create duties that do not exist under common law or by statute.

In sum, I conclude that EgyptAir did not owe a duty to N and R to investigate

---

[25] Bower (correctly) does not argue that these recommendations should be treated as statutes, rules, or regulations supporting a finding of negligence.  "A duty of care must already exist before a plaintiff can use a defendant's statutory violation to support a claim of tort liability."  *Juliano*, 461 Mass. at 532.

[26] Bower has given the court only one such example, Alaska Airlines (which does not operate from JFK).  That airline recommends (but does not require) that passengers document child custody because some countries require proof of custody as a condition for entry.  EgyptAir's Reply at 18-19.

[27] Bower contends that because EgyptAir required the parents of children traveling alone to sign indemnification forms, it in effect has "admitted" that a duty was owed Bower to require a dual consent form from El-Nady.  The court disagrees.  A child traveling unaccompanied by any adult cannot be equated to a child traveling with his or her parent.

whether their mother was traveling with them in violation of a court order.[28] "While dispositive motions are disfavored in negligence actions, where a defendant is determined to owe no duty of care, summary judgment must be granted." *Brown*, 514 F. Supp. 2d at 152, citing *Westerback v. Harold F. LeClair Co., Inc.*, 50 Mass. App. Ct. 144, 146 (2000). That is the case here.[29]

---

[28] The Second Circuit reached the same conclusion in *Pittman v. Grayson*, 149 F.3d 111 (2d Cir. 1998), a case involving similar facts. In *Pittman*, a mother flew with her daughter to Iceland in violation of a court order. The daughter's step-father telephoned two of the airline's corporate offices and gave oral warnings to various employees about the mother's impending flight and that the girl was being taken from Florida in violation of a court order. The Second Circuit affirmed the district court's setting aside of a jury verdict in favor of the plaintiff father (individually, and on behalf of his daughter). With respect to the father's request to remand the case on a claim of negligence, the Court declined, holding that the commercial airline owed no duty to the father or to the daughter as a passenger, "either generally or based on oral representations – to ensure that a minor traveling with a custodial parent is not being transported in violation of a court order." *Id.* at 125.

The California Appeals Court, Second Division, endorsed the Second Circuit's conclusion in a case again involving very similar facts (a mother took her child to Japan in violation of a court order not to do so). "Plaintiff lacks a viable negligence claim because ANA [the air carrier] owed him no duty of care; plaintiff was a member of the general public and had not entered into a special relationship with ANA; and although ANA certainly owed some duties of care to Melissa as a passenger, we have seen no authority for the proposition that a common carrier has a duty to ensure that a minor traveling with a custodial parent is not being transported in violation of a court order." *Braden v. All Nippon Airways Co., Ltd.*, 2010 WL 3993215, at *4 (Cal. App. 2 Dist. Oct. 13, 2010).

[29] The claims for negligent infliction of emotional distress fail as they are premised on a finding of negligence. *See Rodriguez v. Cambridge Hous. Auth.*, 443

ORDER

For the foregoing reasons, defendant EgyptAir's motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment for EgyptAir and dismiss it from the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

Mass. 697, 700-701 (2005).  Absent legal responsibility, Bower's claim against EgyptAir for loss of filial consortium also fails. *See* Mass. Gen. Laws ch. 231, § 85X ("The parents of a minor child or an adult child who is dependent on his parents for support shall have a cause of action for loss of consortium of the child who has been seriously injured *against any person who is legally responsible for causing such injury*.") (emphasis added).